UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

ELIZABETH MADISON,

        Plaintiff,

    v.                                  Civil Action 2:20-cv-506
                                         Magistrate Judge Chelsey M. Vascura

COMMISSIONER OF SOCIAL
SECURITY,

        Defendant.

## OPINION AND ORDER

Plaintiff, Elizabeth Madison ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income Benefits and Disability Insurance Benefits.  This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 12), the Commissioner's Memorandum in Opposition (ECF No. 13), and the administrative record.  (ECF No. 7.)  For the reasons that follow, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner's decision.

### I.      PROCEDURAL HISTORY

Plaintiff filed her application for Title II Disability Insurance Benefits on May 23, 2016 (R. 256–57) and Title XVI Supplemental Security Income Benefits on May 24, 2016 (*id*. at 258–63), alleging in both that she had been disabled since January 19, 2014.  (*Id.* at 256–63.)  Following administrative denials of Plaintiff's applications initially and on reconsideration, Administrative Law Judge Timothy Gates (the "ALJ") held a hearing on August 17, 2018.  (*Id.*

at 39–96.)  At the hearing, Plaintiff, represented by counsel, appeared and testified.  (*Id.* at 47–89.)  Vocational expert Connie O'Brien-Heckler (the "vocational expert") also appeared and testified.  (*Id.* at 89–94.)  On November 7, 2018, the ALJ issued a decision denying benefits.  (*Id.* at 15–31.)  On November 26, 2019, the Appeals Council denied Plaintiff's request for review and adopted the ALJ's decision as the Commissioner's final decision.  (R. 1–6.)  Plaintiff then timely commenced the instant action.  (ECF No. 1.)

Plaintiff raises four issues in her Statement of Errors.  (ECF No. 12.)  Plaintiff first argues that the RFC the ALJ assessed is not supported by substantial evidence.  (Pl.'s Statement of Errors 10–12, ECF No. 12.)  Next, Plaintiff contends that the ALJ erred in failing to properly evaluate the role of Plaintiff's alcohol abuse in determining her disability.  (*Id.* at 12–14.)  Third, Plaintiff asserts that there is not substantial evidence that a significant number of jobs exist in the national economy that Plaintiff can perform.  (*Id.* at 14–15.)  Finally, Plaintiff argues that the ALJ erred in failing to fully and fairly develop the record.  (*Id.* at 16.)

## II.    ALJ'S DECISION

On November 7, 2018, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 15–31.)  At step one of the sequential

evaluation process,[1] the ALJ found that Plaintiff had not engaged in substantial gainful activity since January 19, 2014, the alleged onset date. (*Id.* at 18.) The ALJ went on to analyze the Title II and Title XVI claims separately due to differing relevant time periods. (*Id.* at 18–31.) At step two for the Title II claim, the ALJ found that Plaintiff's only medically determinable impairment was alcohol abuse. (*Id.* at 18.) At step three for the Title II claim, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments for the disability period (January 19, 2014–June 30, 2014). (*Id.* at 18–20.) Specifically, the ALJ found that the record had "references to bipolar disorder, depression, and anxiety disorders; however, there is no evidence to establish the existence of a medically determinable mental impairment. There is no evidence that the claimant was utilizing treatment [during the alleged disability period] for mental impairments." (*Id.* at 19.) Therefore, the ALJ concluded that Plaintiff was not disabled for the purposes of Title II of the Social Security Act for the alleged disability period. (*Id.* at 20.)

---

[1] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. § 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

At step two for the Title XVI claim, the ALJ found that Plaintiff had the severe impairments of alcohol dependence and polysubstance dependence; bipolar I disorder; depression disorder; generalized anxiety disorder; posttraumatic stress disorder; and schizoaffective disorder.  (R. 20.)  At step three for the Title XVI claim, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the Listings in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 20–22.)  Specifically, he found that Plaintiff's mental impairments did not meet or medically equal Listing 12.03 (schizophrenia spectrum and other psychotic disorders); Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders); or 12.15 (trauma- and stressor-related disorders).  (*Id.*)

At step four of the sequential process, the ALJ set forth Plaintiff's RFC as follows:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertion levels but with the following nonexertional limitations: The claimant can perform routine, repetitive tasks with no strict production requirements or requirements for sustained fast pace.  She can interact occasionally with supervisors and coworkers but no interaction with the general public.  She can adapt to a static work environment in which changes are explained in advance.

(*Id.* at 22.)

At step five of the sequential process, the ALJ, relying on the vocational expert's testimony, found that Plaintiff could make a successful adjustment to other work that existed in significant numbers in the national economy.  (*Id.* at 30–31.)  The ALJ therefore concluded that Plaintiff also was not disabled under Title XVI of the Social Security Act.  (*Id.* at 31.)

### III.    RELEVANT EVIDENCE OF RECORD

The following summarizes the medical evidence relevant to Plaintiff's Statement of Errors.

A.      **Mental Health and Substance Abuse Symptoms**

1.      **Plaintiff's Reports and Testimony**

On May 24, 2016, Plaintiff completed a Disability Report in which she stated she had Bipolar Disorder, Manic Depression, and Alcoholism.  (R. 306.)  In the report, she wrote that she was not currently working because of her conditions.  (*Id.* at 306.)  In a January 2017 Disability Report on appeal, Plaintiff stated that she had mental conditions, "including emotional or learning problems."  (*Id.* at 340.)

At the August 2018 hearing, Plaintiff testified that when she had previously worked, she "had just problems with concentration.  Like I can't keep on task . . . Makes it difficult to stay in the same position and actively complete my work assignment."  (R. 48.)  Plaintiff offered conflicting reports about her alcohol consumption; she testified that she had not had alcohol since February 2015, but shortly thereafter admitted to drinking in June 2018.  (*Id.* at 57–58.) Plaintiff repeatedly testified that she never abused prescription drugs, but later admitted to intentionally overdosing on prescription medication.  (*Id.* at 58, 68.)  Plaintiff testified to completing in-patient treatment programs for alcohol abuse.  (*Id.* at 68–71.)  Plaintiff stated that "my recovery is my priority in life right now."  (*Id.* at 68.)  Finally, Plaintiff testified that she took several different medications for depression, anxiety, schizoaffective, bipolar, and posttraumatic stress disorders.  (*Id.* at 56, 83–84.)

2.      **Treatment Notes and Evaluations**

In March and April 2012, Plaintiff attended an inpatient substance abuse treatment center. (R. 1393–1411.)  She was diagnosed with alcohol dependence, with physiological dependence. (*Id*. at 1400.)  When she was discharged, the program staff noted that she successfully completed the program and that her progress was "very good."  (*Id.* at 1409, 1411.)

5

In 2012 and 2013, Plaintiff was treated at another substance abuse treatment facility in Colorado for alcohol abuse. (R. 396–409.) The records indicate that, at that time, Plaintiff did not have other mental health problems in addition to substance abuse. (*Id.* at 399, 406.)

In February 2015, Plaintiff had moved to Ohio and began mental health treatment at Behavioral Healthcare Partners in Zanesville, Ohio. (R. 460–483.) In an assessment on February 9, 2015, her provider diagnosed her with Alcohol Dependence and Bipolar Disorder. (*Id.* at 481.)

In August 2015, Plaintiff began counseling at Muskingum Counseling Center. (R. 484–501.) During a mental health assessment on August 10, 2015, her provider diagnosed her with Bipolar I Disorder and Anxiety Disorder, but had generally unremarkable findings. (*Id.* at 484–92.) Another mental health assessment on August 24, 2016, was similarly unremarkable but added a diagnosis of panic disorder. (*Id.* at 493–501.)

In September 2015, Plaintiff set up primary care with Courtney Bonner, D.O. (R. 644–653.) During the first visit, Dr. Bonner diagnosed Plaintiff with Anxiety, Depression, Tobacco Abuse, an Upper Respiratory Infection, and a Wheeze. (R. 646.) In November 2015, Plaintiff returned to Dr. Bonner for a follow-up about anxiety and reported minimal improvement. (*Id.* at 654.) The next month, Plaintiff reported continuing difficulties with anxiety. (*Id.* at 660.) In February 2016, Plaintiff reported improved depression symptoms, but worsened anxiety symptoms. (*Id.* at 661.) In April 2016, Plaintiff returned to Dr. Bonner and reported issues with anxiety, depression, and alcohol abuse. (*Id.* at 663–67.)

In July 2016, Laura Johnson, LISW, conducted a Behavioral Health Evaluation on Plaintiff. (R. 681–87.) Ms. Johnson noted that Plaintiff had a history of abusing both alcohol and prescription drugs. (*Id.* at 683.) Ms. Johnson diagnosed Plaintiff with Bipolar Disorder,

Unspecified Anxiety Disorder, Alcohol Dependence, and history of abusing prescriptions. (*Id.* at 682.)

Plaintiff was hospitalized in April 2016, and the hospital conducted a mental health diagnostic assessment. (R. 502–508.) In that assessment, the provider diagnosed Plaintiff with Major Depressive Disorder, Severe, with anxious features, but determined that "[f]urther evaluation and additional information is needed to rule out Bipolar Disorder and/or Social Anxiety Disorder." (*Id.* at 506.)

In mid-April 2016, Plaintiff had an Alcohol and Other Drug Assessment. (R. 1006–15.) During the assessment, Plaintiff reported daily drinking, drinking and driving, and that her alcohol use caused problems in relationships and at work. (*Id.* at 1010.) In May 2016, Plaintiff attended an inpatient program to treat her alcohol abuse. (*Id.* at 1004–05.) She left the treatment program against the advice of staff. (*Id.* at 1004.)

Plaintiff participated in a drug and alcohol recovery program during the summer of 2016. (R. 509–603.) Plaintiff self-referred to the program. (*Id.* at 516.) During an initial assessment, Plaintiff reported having difficulties with mental health issues, but stated she needed "to get the drinking under control first." (*Id.* at 517.)

From July 8–14, 2016, Plaintiff was hospitalized in Pennsylvania for a suicide attempt. (R. 604–43.) During the stay, Plaintiff was diagnosed with Alcohol dependence, binge pattern; Anxiety disorder; Bipolar affective disorder; Depression (emotion); and Posttraumatic Stress Disorder. (*Id.* at 604.) During her stay at the hospital, Plaintiff attended and appropriately participated in group therapy. (*Id.* at 618–28.) The hospital discharged her when she "met [her] treatment goals." (*Id.* at 604.)

In August 2016, Janice Peterson, Ph.D. conducted a consultative examination of Plaintiff. (R. 689–95.)  Dr. Peterson noted that Plaintiff's affect was "cooperative and flat" during the exam.  (*Id.* at 692.)  Plaintiff reported having suicidal ideation and habitually cutting herself. (*Id.*)  Plaintiff reported going days and weeks without sleep, using alcohol and drugs, and overspending money.  (*Id.*)  Plaintiff reported that her anxiety "fluctuates from a 3 to 9 on a scale of 1–10."  (*Id.*)  Plaintiff also reported having panic attacks.  (*Id.*)  Plaintiff reported both visual and auditory hallucinations.  (*Id.* at 693.)  Finally, Dr. Peterson noted that Plaintiff was "alert and clear.  She was oriented to person, place, time, and situation."  (*Id.*)

In August 2016, Plaintiff saw Avneet Hira, M.D., complaining of depression.  (R. 696.) During the appointment, Plaintiff admitted to lying to Dr. Hira in an attempt to get prescription medication.  (*Id.*)  Dr. Hira also believed Plaintiff was taking triple the amount prescribed of one of her medications.  (*Id.*)

From September 8–11, 2016, Plaintiff was hospitalized for binge drinking and suicidal ideation.  (R. 711–718, 762.)  In her discharge summary, her doctor noted that "[a]lcohol use is [the] main behavioral concern."  (*Id.* at 742.)  Plaintiff represented to the hospital that she would be going to a substance abuse treatment facility immediately after her release.  (*Id.* at 713.)  On September 12, 2016, Plaintiff went to Pickaway Area Recovery Services.  (R. 700.)  After completing the initial assessment, Plaintiff left without completing any further treatment.  (*Id.*) During the assessment, the counselor recommended Plaintiff complete a 4–6-month residential treatment program.  (*Id.* at 706.)

Plaintiff was again hospitalized from September 24–27, 2016, after she was arrested for driving while intoxicated and voiced suicidal ideation.  (R. 810.)  After an examination, her doctor determined she had stopped taking her psychiatric medication.  (*Id.* at 813.)  Plaintiff was

hospitalized yet again from September 29, 2016, through October 5, 2016. (*Id.* at 868–1003.) Plaintiff had overdosed on prescription drugs in a suicide attempt. (*Id.* at 971.)

At the end of September 2016, Plaintiff had a psychological evaluation with Patricia Gainor, M.D. (R. 719–29.) Dr. Gainor found Plaintiff's psychiatric symptoms were within normal limits. (*Id.* at 724–25.) Dr. Gainor conducted periodic psychological evaluations of Plaintiff from October 2016 through April 2018, and her findings in those evaluations were similarly unremarkable. (*Id.* at 1140–1169, 1201–20.)

In November 2016, Plaintiff was hospitalized for another intentional prescription drug overdose. (R. 1022–1046.) Plaintiff denied any suicide attempt. (*Id.* at 1040.) On December 12, 2016, Plaintiff returned to the emergency room with suicidal ideation. (*Id.* 1047–1049.) A few days later, she was hospitalized again because she was going through withdrawal from one of her medications and was "scared she might harm herself." (*Id.* at 1050–1070.)

In December 2016, Plaintiff attended another inpatient program to treat her alcohol abuse. (R. 1016–20.) At the time of admission, she was diagnosed with Severe Alcohol Use Disorder and Alcohol dependence, uncomplicated. (*Id.* at 1020.)

In February 2017, Plaintiff was hospitalized again after overdosing on prescription drugs combined with alcohol. (R. 1071–1106.) When she was admitted, Plaintiff told the hospital staff she "wanted to get high" and "was bored." (*Id.* at 1073.) Later that month, Plaintiff went to a walk-in clinic for help with anxiety. (*Id.* 1116–20.) The clinic wrote her prescriptions for anxiety until she could see her primary care physician. (*Id.*)

In late February 2017, Amy Hubbard, LPCC, conducted a Mental Health Assessment of Plaintiff. (R. 1170–78.) In many areas, Ms. Hubbard found Plaintiff's mental health symptoms

were unremarkable, but Ms. Hubbard noted that Plaintiff's behavior was angry and anxious. (*Id.* at 1174–75.)

From March to May 2017, Plaintiff attended an inpatient substance abuse treatment program. (R. 1121–1139.) She left without completing the program. (*Id.* at 1121.) Plaintiff had previously participated in an outpatient substance abuse support program in Zanesville, Ohio and returned to that program after she left inpatient treatment. (*Id.* at 1221–1279.)

Beginning in March 2018, Plaintiff went to psychotherapy at Perry County Family Practice. (R. 1321–26.) In early March 2018, Plaintiff reported that she was not drinking, but that alcohol "stopped the voices." (*Id.* at 1326.) In April 2018, Plaintiff said that the voices "suggest she would be better off dead." (*Id*. at 1324.) In mid-June 2018, Plaintiff reported significant problems with concentration and focus. (*Id.* at 1321.)

From June 5–13, 2018, Plaintiff was hospitalized again. (R. 1280–1320.) She arrived at the emergency room intoxicated. (*Id.* at 1282.) When she regained awareness, she expressed suicidal ideation and admitted she had not taken her psychiatric medication for "the last couple of days." (*Id.*)

In July 2018, Plaintiff attended another inpatient substance abuse treatment center. (R. 1347–70.) On admission, Plaintiff reported that "my life is falling apart because I can't stop drinking." (*Id.* at 1347.) When she was discharged on August 20, 2018, the treatment staff noted that Plaintiff was "fully functioning and demonstrate[d] a good ability to cope with withdrawal symptoms" and that Plaintiff "report[ed] a mental health diagnosis, but [it] doesn't significantly interfere with addiction treatment." (*Id.* at 1359.)

On August 3, 2018, Stephen Ulrich, M.D. completed a Physical Residual Functional Capacity Assessment on behalf of Plaintiff. (R. 1328–35.) Dr. Ulrich opined that Plaintiff "has

severe schizophrenia.  She constantly hears voices and then argues with them."  (*Id.* at 1332.)
Dr. Ulrich added that Plaintiff "has used alcohol to self-medicate her psychiatric symptoms and
this has resulted in alcohol dependence which further impair[s] her ability in the workplace."
(*Id.* at 1333.)

**B.      Activities of Daily Living**

In July 2016, Plaintiff completed a function report in which she stated "I don't get much
sleep but when I get out of bed, I move to the couch to watch television.  At around 4pm, I eat a
small snack and return to the couch." (R. 314.)   She reported that during manic episodes, she
needed to be reminded to shower.  (*Id.* at 315.)  Plaintiff reported that she did not prepare food
for herself because she gets "distracted and sometimes have forgot [*sic*] to turn off the stove."
(*Id.*)  Plaintiff said she was able to do the dishes and the laundry and went outside a couple times
a day.  (*Id.* at 315–16.)  Plaintiff reported that she only socialized with others at Alcoholics
Anonymous meetings, and otherwise stayed "home alone."  (*Id.* at 317.)  Plaintiff reported that
her conditions affected her abilities in the following ways: memory, completing tasks,
concentration, understanding, following instructions, and getting along with others.  (*Id.* at 318.)

During a consultative examination with Janice Peterson, Ph.D. in August 2016, Plaintiff
reported that she "gets up at 5:00am, takes a shower occasionally, eats once a day, and lies down
in bed at 10:00pm."  (R. 691.)  Plaintiff said she socializes with her boyfriend by going to dinner
and movies.  (*Id.*)  Plaintiff reported that her boyfriend performed all the household chores and
occasionally helped her shower.  (*Id.* at 691–92.)

At the 2018 hearing, Plaintiff testified sometimes she "can't sleep for days at a time.  I
have terrible insomnia."  (R. 55.)  She testified that she attended Alcoholics Anonymous
meetings once or twice a week, and that her mom usually drove her because Plaintiff did not
have a driver's license.  (*Id.* at 61.)  At the hearing, Plaintiff said she did not go to movies with

her boyfriend and only went to restaurants occasionally. (*Id.* at 62.) Plaintiff testified that her

boyfriend had to remind her to shower and take her medication. (*Id.* at 80–81.) Plaintiff said she

would be in bed from 9:00 P.M. to 4:00 A.M. every night but would only sleep "[m]aybe an

hour." (*Id.* at 82.) Plaintiff further testified that she would take two- to three-hour naps twice a

day. (*Id.* at 85–86.)

## IV.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the

Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to

proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C.

§ 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir.

1994)).

Although the substantial evidence standard is deferential, it is not trivial.   The Court

must  "take into account whatever in the record fairly detracts from [the] weight" of the

Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to

that  finding 'even if there is substantial evidence in the record that would have supported an

opposite  conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)

(quoting *Key v. Callahan*, 109  F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's

decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## V.     ANALYSIS

Plaintiff raises four issues in her Statement of Errors: (1) the RFC the ALJ assessed is not supported by substantial evidence; (2) the ALJ erred in failing to properly evaluate the role of Plaintiff's alcohol abuse in determining her disability; (3) there is not substantial evidence that a significant number of jobs exist in the national economy that Plaintiff can perform; and (4) the ALJ erred in failing to fully and fairly develop the record.  (Pl.'s Statement of Errors 10–16, ECF No. 12.)  The Court addresses these arguments, in turn.

**A.     The ALJ did not err in crafting the RFC.**

Plaintiff argues that the RFC is not supported by substantial evidence.  (Pl.'s Statement of Errors 10–12, ECF No. 12.)  Specifically, Plaintiff argues that the ALJ failed to properly incorporate the opinion of the consultative examiner into the RFC and failed to include certain limitations from the examination of the vocational expert into the RFC.  (*Id.*)

**1.     The RFC is supported by substantial evidence.**

Plaintiff argues that, as a whole, the RFC is not supported by substantial evidence.  (Pl.'s Statement of Errors 10–12, ECF No. 12.)

The ALJ is charged with the final responsibility for determining a claimant's residual functional capacity.  *See* 20 C.F.R. § 404.1527(d)(2) (the final responsibility for deciding the residual functional capacity "is reserved to the Commissioner").  Moreover, the Social Security Act and agency regulations require an ALJ to determine a claimant's residual functional capacity based on the evidence as a whole.  42 U.S.C. §§ 423(d)(5)(B), 1382c(a)(3)(H)(i) (incorporating

13

§ 423(d) for Title XVI); 20 C.F.R. § 404.1546(c) ("If [the] case is at the administrative law judge

hearing level . . . the administrative law judge . . . is responsible for assessing your residual

functional capacity."). As the court recognized in *Henderson v. Comm'r of Soc. Sec.*, No. 1:08-

cv-2080, 2010 WL 750222 (N.D. Ohio Mar. 2, 2010), the ALJ is charged with evaluating several

factors in determining the residual functional capacity, including the medical evidence (not

limited to medical opinion testimony) and the claimant's testimony. *Id.* at *2 (citing *Webb v.

Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004); SSR 96-5P, 1996 WL 374183 (July 2,

1996); SSR 96-8P, 1996 WL 374184 (July 2, 1996)).

An ALJ's RFC assessment is based upon consideration of all relevant evidence in the

case record, including medical evidence and relevant non-medical evidence regarding what work

a claimant is capable of performing. SSR 96-5P, 1996 WL 374183 (July 2, 1996). Social

Security Ruling 96-8p instructs that the ALJ's residual functional capacity assessment must be

based on all of the relevant evidence in the case record, including factors such as medical history,

medical signs and laboratory findings, the effects of treatment, daily activities, lay evidence,

recorded observations, medical source statements, effects of symptoms, and evidence from

attempts to work. SSR 96-8P, 1996 WL 374184 (July 2, 1996).

Here, the ALJ explained how he reached the RFC, in part, as follows:

After careful consideration of the evidence, the undersigned finds that the
claimant's medically determinable impairments could reasonably be expected to
cause the alleged symptoms; however, the claimant's statements concerning the
intensity, persistence and limiting effects of these symptoms are not entirely
consistent with the medical evidence and other evidence in the record for the
reasons explained in this decision. The record includes evidence strongly
suggesting that the claimant has exaggerated symptoms and limitations, particularly
related to hallucinatory activity and mental symptoms, in light of inconsistencies in
such statements throughout the record. The claimant was noncompliant with
medication, counseling, and substance abuse treatment despite noted improvement
in each. She had periods of stability, particularly when compliant. She made
various statements related to living with a friend in Pennsylvania. For example,

14

she alleged at the hearing that she became overwhelmed and attempted suicide. However, she denied consuming alcohol at that time.  This is inconsistent with treatment notes, which state the friend had become violent, was using alcohol and drugs, and the claimant was also drinking at that time.  Her main issue is alcohol abuse and not substance-induced mental impairment or mental impairments, generally.

(R. 23.)

When making the RFC determination, the ALJ properly considered the record as a whole. The ALJ considered medical evidence, Plaintiff's testimony, evidence inconsistent with Plaintiff's statements, and the effectiveness of treatment when Plaintiff complied.  Accordingly, the Court finds the RFC the ALJ assessed is supported by substantial evidence.

Plaintiff further argues that the ALJ failed to properly consider the opinion of the consultative examiner when crafting the RFC and improperly failed to include certain limitations from the examination of the vocational expert into the RFC.  The Court addresses both arguments in turn.

2.      **The ALJ did not err in considering the opinion of Janice Peterson, Ph.D., consultative examiner.**

Plaintiff argues that the ALJ's consideration of the opinion of consultative examiner Janice Peterson, Ph.D., was not supported by substantial evidence.  (Pl.'s Statement of Errors 11, ECF No. 12.)  Specifically, Plaintiff contends that the "RFC ignores the conclusion of Dr. Janice [Peterson][2]" that Plaintiff would be limited in her ability to complete repetitive tasks and in her ability to respond appropriately to workplace pressures.  (*Id.*)

Dr. Peterson performed a consultative examination of Plaintiff on August 20, 2016, after which she diagnosed Plaintiff with Bipolar I Disorder, MRE [Most Recent Episode] Mixed, with

[2] Throughout Plaintiff's Statement of Errors, Plaintiff refers to Dr. Janice Peterson as "Dr. Janice Pierson."  Because Plaintiff only has evidence of one psychological consultative examination in the record, the Court assumes this was merely an oversight.

15

mood in-congruent psychotic features; Generalized Anxiety Disorder, with occasional panic attacks; Alcohol Use Disorder, Severe; and Opioid Use Disorder, Severe, In Early Remission. (R. 688–695.) Dr. Peterson stated that during the evaluation Plaintiff "did not display eccentric or impulsive behaviors," and that Plaintiff "was generally understandable, with no receptive or expressive language." (*Id.* at 692.) Plaintiff reported feeling "unhappy, stressed and tired" and stated she had three panic attacks a week. (*Id.*) Plaintiff reported hearing voices, but Dr. Peterson noted that Plaintiff was "alert and clear. She was oriented to person, place, time and situation." (*Id.* at 693.) Although Plaintiff reported an ability to complete repetitive tasks, Dr. Peterson concluded that "[d]ue to mental health symptoms [Plaintiff] would be expected to have impairments in her ability to complete repetitive tasks in a work setting." (*Id.* at 694.) Dr. Peterson further opined that Plaintiff's mental health conditions would "negatively impact her ability to respond to pressures in a work setting." (*Id.* at 694–5.)

As a non-treating practitioner, Dr. Peterson's opinion is not entitled to any particular deference. Consultative examiners' opinions must be meaningfully evaluated according to the factors set forth in 20 CFR § 404.1527(c), but an ALJ need not give "an exhaustive factor-by-factor analysis." *Kent v. Comm'r of Soc. Sec.*, 142 F. Supp. 3d 643, 650 (S.D. Ohio 2015) (quoting *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011)). Because a consultative examiner usually meets with the claimant only once, they usually do not have an on-going treatment relationship with the claimant to trigger the deference owed to treating physicians. *Andres v. Comm'r of Soc. Sec.*, 733 F. App'x 241, 245–46 (6th Cir. 2018) (the absence of an on-going treatment relationship means "the ALJ is entitled to give less weight to the consultative examiner's opinion") (citing *Staymate v. Comm'r of Soc. Sec.*, 681 F. App'x 462, 467 (6th Cir. 2017)).

Even if an ALJ assigns great weight to a medical opinion, he need not adopt the entire medical opinion when crafting the RFC.  *See Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) ("Even where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt [it] verbatim; nor is the ALJ required to adopt the . . . limitations wholesale.").  This is especially true when the medical opinion comes from a non-treating source.  *See Myers v. Comm'r of Soc. Sec.,* No. 2:19-CV-2060, 2019 WL 7046408, at *7 (S.D. Ohio Dec. 23, 2019), *report and recommendation adopted,* No. 2:19-CV-2060, 2020 WL 880778 (S.D. Ohio Feb. 21, 2020) ("The Sixth Circuit has rejected the argument that an ALJ must explain every omitted restriction from a non-treating physician's opinion.") (citing *Martin v. Comm'r of Soc. Sec*., 658 F. App'x 255, 259 (6th Cir. 2016)).

The ALJ provided the following discussion of Dr. Peterson's opinions:

The claimant previously underwent a consultative psychological examination performed by Dr. Peterson in August 2016.  A review of the claimant's substance abuse and behavioral health history also note that the claimant received treatment for substance abuse, on a regular basis.  She also alleged multiple suicide attempts, although as noted above, that is not a consistent statement throughout the record.  She reported that she had problems dealing with work, such as focus and concentration; however, this is not consistent with statements that she previously made, stating that she was a good worker but had been fired or unable to work due to alcohol.  She reported minimal daily activities but it is unclear from the other evidence whether this is due to alcohol abuse or mental symptoms.  She was independent in self-care tasks.  She also appeared neat and clean.  She exhibited good eye contact without eccentric or impulsive behaviors.  She did not exhibit psychomotor retardation or agitation.  She appeared cooperative and flat.  She appeared fidgety.  She also alleged hallucinations and obsessive compulsive symptoms, which is not reported consistently in the record, particularly the claimant's allegations of hallucinations.  She also reported past trauma and trauma-related symptoms, although at other times she denied this.  During the exam, the claimant exhibited fair concentration and persistence and average pace.  She alleged overspending money and forgetting to pay bills.  She also alleged inability to seek out appropriate resources or live independently.  However, this is not consistent with allegations pertaining to the claimant's self-referral for treatment or other statements, wherein she denied problems with spending or managing money.  Dr. Peterson diagnosed bipolar I disorder (MRE mixed with mood incongruent psychotic features); generalized anxiety disorder with occasional panic attacks;

alcohol use disorder (severe) and opioid use disorder (severe, in early remission). Dr. Peterson noted limitations in all areas but generally noted no more than moderate impairment and did not offer an opinion that would preclude all work. The undersigned gives significant weight to this examination and assessment, to the extent that it supports the residual functional capacity, above.  Although Dr. Peterson did not offer a specific, function-by-function analysis of what the claimant could do despite her impairments, it does offer some insight in the degree of limitation in each area of functioning, not inconsistent with this decision. Accordingly, the undersigned gives this significant weight.

(R. 28.)

The Court finds the ALJ's consideration of Dr. Peterson's opinion is supported by substantial evidence.  The ALJ incorporated many of Dr. Peterson's suggestions into the RFC. For example, Dr. Peterson opined that Plaintiff "tends to isolate and stay to herself," and the RFC provides that Plaintiff "can interact occasionally with supervisors and coworkers but no interaction with the general public."  (R. 22, 694.)  As another example, Dr. Peterson opined that Plaintiff's "ability to understand, remember, and carry out multi-step, complex instructions would be expected to be moderately impacted," and the RFC provides that Plaintiff can "perform routine, repetitive tasks" and that "changes are to be explained in advance."  (*Id.*)  The ALJ was not required to adopt all aspects of Dr. Peterson's opinion into the RFC.  Moreover, Plaintiff fails to specify what additional limitations the ALJ should have included in the RFC as a result of Dr. Peterson's evaluation.  Indeed, Dr. Peterson's opined limitations were non-specific and unquantified, such that the ALJ could not extract definitive limitations for inclusion in the RFC. (*See* R. 694–95, noting that Plaintiff would be expected to have unspecified "impairments in her ability to complete repetitive tasks" and that her mental health symptoms would, in an unspecified way, "negatively impact her ability to respond appropriately to pressures in a work setting".)  Accordingly, the Court finds that the ALJ's consideration of Dr. Peterson's opinion is supported by substantial evidence.

3.      **The ALJ properly considered Plaintiff's likely absenteeism.**

Finally, Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ failed to include two limitations from hypothetical questions the ALJ posed to the vocational expert: (1) that Plaintiff would be off-task at least ten percent of the time; and (2) that Plaintiff would be expected to miss substantial time from work.  (Pl.'s Statement of Errors 11, ECF No. 11.)

During the hearing, the ALJ asked the vocational expert about a hypothetical person of Plaintiff's age and education, who does not have exertional limitations, who can perform routine, repetitive tasks with no strict production or sustained fast pace requirements, who can occasionally interact with supervisors and coworkers, but not the general public, and who can adapt to changes in the workplace.  (R. 92.)  The ALJ added the additional hypothetical limitation that the individual would be off-task for more than ten percent of the time, and the vocational expert responded that such an additional limitation would be work-preclusive.  (*Id.* at 93–94.)  Next, the ALJ added the hypothetical limitation that the individual would miss two days of work per month, and the vocational expert again responded that such an additional limitation would be work-preclusive.  (*Id.* at 94.)  Plaintiff seems to contend that the ALJ should have included both limitations into the RFC and, therefore, determined that Plaintiff is disabled.  (Pl.'s Statement of Errors 11, ECF No. 12.)

Here, Plaintiff refers in generalities to her history of hospitalizations to support her claim that she would miss substantial time from work.  (Pl.'s Statement of Errors 11–12, ECF No. 12.)  Plaintiff offers as support that "[t]he history of [Plaintiff] experiencing the inability to concentrate and her memory loss, as reported by [Plaintiff] was credible.  Dr. [Peterson] . . . stated that [Plaintiff's] self-report of symptoms was consistent with available history and the overall reliability of the assessment was adequate."  (*Id.* at 11.)  Although the record confirms

19

multiple hospitalizations and contains evidence of impaired concentration, nowhere in the record does a medical professional state that Plaintiff would be off-task for at least ten percent of the time or miss substantial time from work. Moreover, there is evidence in the record to support the ALJ's decision not to include those limitations in the RFC. For example, during the consultative examination, Plaintiff was able to "understand and follow simple and moderately complex mental status tasks." (*Id.* at 21, 693.) Although the record shows several hospitalizations, which could contribute to absenteeism, the ALJ fairly attributed those hospitalizations to Plaintiff's alcohol abuse. (*See, e.g.*, *id.* at 22, 509–603, 1280–1320.) Plaintiff may have preferred that the ALJ assessed the record evidence differently, but "it squarely is *not* the duty of the district court . . . to re-weigh the evidence [from the administrative hearing]." *Vance v. Comm'r of Soc. Sec.*, 260 F. App'x 801, 807 (6th Cir. 2008). Accordingly, the Court finds the ALJ's consideration of Plaintiff's possible absenteeism and time spent off-task when crafting the RFC is supported by substantial evidence.

**B.    The ALJ properly considered Plaintiff's alcohol abuse.**

Plaintiff argues the ALJ did not properly evaluate the role of her alcohol abuse when making her disability determination. (Pl's Statement of Errors 12–14, ECF No. 12.) Plaintiff further argues that the ALJ incorrectly categorized Plaintiff's "main issue" as alcohol abuse rather than mental health conditions. (*Id.* at 13.) It is unclear whether Plaintiff takes issue with the ALJ's analysis of Plaintiff's eligibility for Title II benefits, Title XVI benefits, or both. The Court addresses the ALJ's analysis for both types of benefits, in turn.

**1.    The ALJ correctly considered Plaintiff's alcohol abuse for Title II benefits.**

Plaintiff applied for Title II benefits for the time period from January 19, 2014, through June 30, 2014. (R. 20.) Plaintiff argues that the ALJ incorrectly concluded that her main issue during this time was alcohol abuse. (Pl's Statement of Errors 12–14, ECF No. 12.) Plaintiff

further argues that in making this determination at step two, the ALJ failed to follow Social Security regulations. (*Id.*) Plaintiff seems to suggest that if the ALJ had followed regulations, he would have found that she had a serious impairment at step two. (*Id.*)

At step two of the sequential evaluation process, Plaintiff bears the burden of proving the existence of a severe, medically determinable impairment that meets the twelve-month durational requirement. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). The United States Court of Appeals for the Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id.* at 863 (quoting *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 89 n.1 (6th Cir. 1985).

Even though Plaintiff's burden at step two is *de minimis*, it is still Plaintiff's burden. Here, Plaintiff has not identified any evidence supporting the existence of a severe impairment during the Title II disability period, whether as a result of alcohol abuse or mental illness. The record contains no evidence of significant mental health treatment before 2015. In 2012 and 2013, Plaintiff was in two different inpatient substance abuse treatment centers for alcohol abuse. (R. 397–409, 1393–1411.) In 2013, Plaintiff went to the emergency room a few times for physical injuries. (*Id.* at 410–459.) In neither 2012 nor 2013 was Plaintiff's mental health a primary concern. (*Id.* at 397–459, 1393–1411.) There are no treatment records for 2014.

The Court finds no error with the ALJ's assessment that Plaintiff did not have a serious impairment for the Title II disability period. Plaintiff failed to provide *any* treatment records for the disability period. Thus, Plaintiff failed to meet her burden of proving the existence of a

severe, medically determinable impairment that meets the twelve-month durational requirement. Accordingly, Plaintiff's argument that the ALJ failed to properly evaluate the role of her alcohol abuse in determining her disability for Title II benefits is not well taken.

    **2.**        **The ALJ correctly considered Plaintiff's alcohol abuse for Title XVI benefits.**

    Plaintiff also argues that the ALJ failed to properly evaluate the role of her alcohol use in determining her disability for Title XVI benefits. (Pl.'s Statement of Errors 12–14, ECF No. 12.) Plaintiff contends that the ALJ failed to follow the procedures set out in 20 C.F.R. §§ 404.1535(b), 416.935(b). (*Id.* at 13–14.) Plaintiff argues these regulations provide that "[t]he key factor in determining whether substance abuse is a contributing factor material to disability is whether the individual would still be disabled if he or she stopped using drugs or alcohol," and that the ALJ must follow the procedures in those regulations when making the disability determination. (*Id.*)

    Contrary to Plaintiff's assertion, "[s]ubstance abuse is not considered until the Commissioner first makes a finding that a claimant is disabled." *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 380 (6th Cir. 2013) (citing 20 C.F.R. § 404.1535). 20 C.F.R. § 404.1535(a) provides "*[i]f we find that you are disabled* and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a) (emphasis added); *see also* 20 C.F.R. § 416.935; *Hensley v. Comm'r of Soc. Sec.,* No. 1:12-CV-653, 2013 WL 4258852, at *5 (S.D. Ohio Aug. 15, 2013), *report and recommendation adopted,* 2013 WL 5487233 (S.D. Ohio Sept. 29, 2013) ("This process requires the ALJ to *first* determine whether a claimant suffers from a disability before proceeding—if necessary—to a determination of whether the substance abuse is a 'contributing factor material to the determination of disability.'") (quoting 20 C.F.R. §§ 404.1536, 416.935).

22

Here, the ALJ found Plaintiff was not disabled. (R. 31.) As such, the ALJ had no obligation to follow the regulations to which Plaintiff cites. Further, Plaintiff's argument that the ALJ improperly concluded that Plaintiff's main issue was her alcohol abuse is without merit. The record is filled with treatment notes documenting Plaintiff's alcohol abuse. (*See, e.g.*, R. 472–83, 509–643, 700–06, 1004–1020, 1121–39, 1221–1320, 1347–1373.) Further, the ALJ thoroughly discussed the Plaintiff's mental health conditions under Listing 12.03 (schizophrenia spectrum and other psychotic disorders); Listings 12.04 (depressive, bipolar, and related disorders), 12.06 (anxiety and obsessive-compulsive disorders); and 12.15 (trauma- and stressor-related disorders). (*Id.* at 21–22.) Again, it is not the court's purview to re-weigh the evidence, so long as the ALJ's conclusion is supported by substantial evidence. *Vance*, 260 F. App'x, at 807. Accordingly, the Court finds the ALJ did not err in considering and evaluating the role of Plaintiff's alcohol abuse in making the disability determination for the purposes of Title XVI.

**C.      The ALJ's assessment that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform is supported by substantial evidence.**

Plaintiff next argues that the ALJ erred in his assessment that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Pl.'s Statement of Errors 14–15, ECF No. 12.) Plaintiff contends that the ALJ did not properly consider her limitations when determining which jobs she could perform. (*Id.*)

As explained *supra*, during the hearing, the ALJ posed several hypothetical questions to the vocational expert, some of which included limitations that the individual could not interact with coworkers at all, that the individual would be off-task for more than ten percent of the time, or that the individual would miss two days of work per month. (R. 92–94.) The ALJ ultimately decided not to include any of these hypothetical limitations in the RFC. (*Id.* at 22.) Plaintiff seems to argue that the ALJ should have included these limitations in the RFC, and that if these

limitations were included, the ALJ would have found Plaintiff disabled. (Pl.'s Statement of Errors 14–15, ECF No. 12.) Therefore, according to Plaintiff, the ALJ's determination that jobs exist in significant numbers in the national economy that Plaintiff can perform is not supported by substantial evidence. (*Id.*)

The ALJ is not required to incorporate into the RFC all limitations from the hypothetical questions he asks the vocational expert—rather, the ALJ need only incorporate the limitations he deems credible. *Casey v. Sec'y of Health & Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact."). The fact that the ALJ asked the vocational expert about hypothetical limitations does not bind the ALJ to include those limitations in the RFC. *Kessans v. Comm'r of Soc. Sec.*, 768 F. App'x 531, 536 (6th Cir. 2019) ("Indeed, the ALJ may pose a question involving a hypothetical individual with several limitations—and then later decide that those limitations differed from the claimant's limitations. That does not mean that the vocational expert's answer about the *hypothetical individual* binds the ALJ.") (internal citation omitted); *see also Beckham v. Comm'r of Soc. Sec.*, No. 1:19-CV-576, 2020 WL 5035451, at *9 (S.D. Ohio Aug. 26, 2020) ("Simply posing a hypothetical question to the VE does not result in a finding about a claimant's RFC or bind the ALJ where the medical record does not support the inclusion of such limitations.").

The Court finds that the ALJ's decision not to include those limitations in the RFC is supported by substantial evidence. Plaintiff does not cite any record evidence for her claims that she cannot interact with coworkers, would be off task for at least ten percent of the time, and miss at least two days of work per month. Even if Plaintiff had provided such citations to the record, substantial evidence exists to support the ALJ's decision not to include those limitations

24

in the RFC.  For example, Plaintiff was able to successfully interact with others during group therapy sessions.  (*See, e.g.*, R. 21, 1238–1279.)  During the consultative examination, Plaintiff was able to "understand and follow simple and moderately complex mental status tasks."  (*Id*. at 21, 693.)  And although the record shows several hospitalizations, the ALJ fairly attributed those hospitalizations to Plaintiff's alcohol abuse.  (*See, e.g.*, *id.* at 22, 509–603, 1280–1320.) Accordingly, the Court finds that the ALJ's decision to exclude those limitations from the RFC is supported by substantial evidence.

**D.     The ALJ fully and fairly developed the record.**

Finally, Plaintiff maintains that the ALJ erred in failing to develop the record as related to how Plaintiff's alcohol use may have been a factor in her anxiety disorders.  (Pl's Statement of Errors 16, ECF No. 12.)  Specifically, Plaintiff contends the ALJ should have called an expert to "address the issue of Plaintiff's alcohol use and whether it was a factor material to Plaintiff's disability and whether it was the cause of some or all of her mental impairments."  (*Id.*)

The United States Supreme Court has emphasized that "Social Security proceedings are inquisitorial rather than adversarial."  *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000) (plurality). Accordingly, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ." *Id.* at 111.  The United States Court of Appeals for the Sixth Circuit has long recognized the ALJ's duty to fully develop the record through "a full and fair hearing."  *Lashley v. Sec. of Health and Human Serv*., 708 F.2d 1048, 1051–52 (6th Cir. 1983) (recognizing a "special duty" to develop the record in the context of an unrepresented inarticulate claimant).  The *Lashley* court cautioned, however, that "the administrative law judge must not become a partisan and assume the role of counsel."  *Id*. at 1051.

In this case, Plaintiff was represented by counsel at the administrative hearing, thus the *Lashley* "special duty" standard does not apply.  Further, even if Plaintiff were unrepresented,

"[n]othing in *Lashley* requires the ALJ to conduct an independent investigation of a claimant's medical condition outside the courtroom." *McKenzie v. Comm'r of Soc. Sec.*, No. 13-CV-11272, 2014 WL 4793884, at *3 (E.D. Mich. Sept. 25, 2014) (citing *Lashley*, 708 F.2d at 1051). That the record does not contain evidence as to whether Plaintiff's alcohol abuse was a cause of her anxiety disorders does not compel the ALJ to call an expert. *Compare Winning v. Comm'r of Soc. Sec.,* 661 F. Supp. 2d 807, 822–25 (N.D. Ohio 2009) (remanding because the ALJ failed to rely on *any* mental health expert) *with Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 189 (6th Cir. 2009) ("20 C.F.R. §§ 404.1527(f)(2)(iii) and 416.927(f)(2)(iii) provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony, stating that ALJs may . . . ask for and consider opinions from medical experts on the nature and severity of [a claimant's] impairment(s) . . . .") (internal quotations omitted).

The ALJ thoroughly considered Plaintiff's alcohol abuse and anxiety disorders, and the effects they had on her abilities and limitations. (R. 21–22, 23–28.) Thus, there is no evidence that the ALJ's failure to call an expert about a causal connection between alcohol use and anxiety disorders prejudiced Plaintiff, let alone denied her a full and fair hearing. Moreover, the burden of proving disability rests with Plaintiff, not with the ALJ. *See, e.g., Wilson v. Comm'r of Soc. Sec.,* 280 F. App'x 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)); *Struthers v. Comm'r of Soc. Sec.,* 1999 WL 357818, at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of [an] impairment."); *Landsaw v. Sec'y of Health & Human Servs.,* 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests

with the claimant.") (citations omitted).  Accordingly, Plaintiff's argument that the ALJ failed to fully and fairly develop the record is not well taken.

## VI.    DISPOSITION

In sum, from a review of the record as a whole, the Court concludes that substantial evidence supports the ALJ's decision denying benefits.  For the foregoing reasons, the Court **OVERRULES** Plaintiff's Statement of Errors and **AFFIRMS** the Commissioner of Social Security's decision.

**IT IS SO ORDERED.**


/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE